## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Gregory Parrott, being duly sworn, depose and state that:

### I.     INTRODUCTION

1. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances, namely heroin and crack cocaine), 21 U.S.C. § 846 (conspiracy and attempt to possess with intent to distribute and to distribute controlled substances), and 21 U.S.C. § 843(b) (use of communication facilities to facilitate drug trafficking offenses) (the "**Subject Offenses**") will be found on the following cellular phones, as described in **Attachment A**:

   1. **Subject Device 1**: a Black IPhone, IMEI number 357265090743087, SIM number 8901260062 904169584 F, with an unknown phone number;

   2. **Subject Device 2**: a Silver Android LG smartphone, IMEI number 356284103147609, SIM number 8901260071 975872646 F 161652, with an unknown phone number; and

   3. **Subject Device 3**: a White IPhone with a teal green case, IMEI number 356432107604543, SIM number 8931253000 2111236947 S01003A, with an unknown phone number,

currently in the possession of the Lansing Police Department, 5815 Wise Rd, Lansing, Michigan (collectively the "**Subject Devices**"). The categories of electronically stored information and evidence sought are described in **Attachment B**.

2. This Application requests the issuance of a search warrant to examine the **Subject Devices** for evidence of the **Subject Offenses**.

## II.     APPLICANT'S TRAINING AND EXPERIENCE

3.     I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2020. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. I have been a police officer with the Lansing Police Department for approximately 19 years, 3 of which I was assigned as an investigator with the Lansing Police Special Operations Section (SOS), which is tasked with investigating narcotics trafficking. During my time as an SOS Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records, and have also made several narcotic purchases in an undercover role. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation

of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

4. I respectfully submit that there is probable cause to believe that COREY ANTUAN EVANS and KEEGAN NISSAN HINTON have engaged in the distribution of, and in the possession with intent to distribute, heroin and crack cocaine, and that they have conspired to do the same, in violation of 21 U.S.C §§ 841(a)(1) and 846. Additionally, there is probable cause to believe that EVANS and HINTON have used communication facilities, namely the Subject Devices, to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b).

5. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### III. PROBABLE CAUSE

6. In the summer of 2020, the Special Operations Section ("SOS") of the Lansing Police Department (LPD) was conducting an investigation into drug trafficking by subjects COREY EVANS and KEEGAN HINTON. EVANS was on federal supervised release following a conviction and 108-month prison sentence for possession with intent to distribute cocaine (21 U.S.C. §§ 841(a)(1) and (b)(1)(C)) and possession of a firearm in furtherance of drug trafficking (18 U.S.C. § 924(C)(1)(a)(I)).

7. In or about June 2020, SOS Officer Jeffrey Lenneman spoke with United States Probation Officer Michael Bennett about EVANS. Probation Officer Bennett

confirmed with SOS Officer Jeffrey Lenneman that the phone number that EVANS provided to United States Probation for purposes of supervised release was (616) 929-2112. Probation Officer Bennett indicated that he regularly spoke to EVANS while EVANS was using phone number (616) 929-2112. According to Probation Officer Bennett, as a condition of his supervised release, EVANS was on home detention with electronic monitoring (*i.e.*, a tether) at the address of 1112 Kelsey Ave., Lansing, Michigan, from July 8, 2020, until his arrest on the Supervised Release petition on August 13, 2020. Prior to July 8, 2020, EVANS's approved residence for purposes of supervised release was at EVANS's sister's residence, also in Lansing, but EVANS was not on location monitoring until July 8, 2020.

8. In June 2020, a Controlled Source[1] ("CS") working with the SOS informed Officer Lenneman that he could purchase cocaine and heroin from EVANS. The CS said EVANS was living with his girlfriend, KEEGAN HINTON, at 1112 Kelsey Ave., in Lansing.

**A. June 23, 2020 Controlled Purchase of .3 Grams Heroin/Fentanyl from EVANS**

9. On June 23, 2020, SOS used the Controlled Source ("CS") to conduct a controlled purchase of heroin from EVANS. Prior to the operation, SOS Officer Jeffrey Lenneman met with the CS at a predetermined location, where Officer Lenneman

---

[1] The CS has prior convictions for a controlled substance offense, fleeing police, resisting/obstructing police, and a driving offense. The CS works with law enforcement for payment for his assistance with controlled purchases of drugs. The CS has successfully participated in over 100 controlled buys with SOS and has provided credible and reliable information respecting criminal activity on numerous additional occasions, which was corroborated by law enforcement through independent investigation.

4

searched the CS and the CS's vehicle for contraband and U.S. currency, with negative results. While in the presence of Officer Lenneman, the CS called EVANS at (616) 929-2112 to arrange the purchase of heroin. The CS used the speaker phone feature and Officer Lenneman could hear EVANS's voice on the other end of the call.

10. Officer Lenneman provided the CS with $40 in pre-recorded funds for the purpose of purchasing heroin from EVANS. The CS then drove, in the CS's vehicle, directly to EVANS's residence at 1112 Kelsey, in Lansing—where EVANS was on home detention pursuant to the terms of his federal supervised release. Law enforcement conducted surveillance of the CS during the drive. When the CS arrived at EVANS's residence, SOS Officer Douglas Hall observed the CS park at 1112 Kelsey, get out of the vehicle, and go inside EVANS's residence through the rear, north-facing door. Shortly thereafter, Officer Hall observed the CS exit the residence and return to the CS's vehicle.

11. Surveillance observed the CS drive back to the predetermined meeting location, where the CS produced to law enforcement a folded piece of paper containing a clear pill capsule. Inside the pill capsule was .3 grams of a tan substance that field-tested positive for heroin and fentanyl. SOS Officer Lenneman again searched the CS for contraband or U.S. currency, with negative results. Based on the information described above, I believe that the CS purchased .3 grams of heroin and fentanyl from EVANS inside EVANS's residence on June 23, 2020.

**B. June 24, 2020 Controlled Purchase of .31 Grams Cocaine Base from EVANS**

12. On June 24, 2020, SOS used the CS to conduct a controlled purchase of crack cocaine from EVANS. Prior to the operation, SOS Officer Jeffrey Lenneman met with the CS at a predetermined location, where Officer Lenneman searched the CS and the CS's vehicle for contraband or U.S. currency, with negative results. In the presence of Officer Lenneman, the CS again contacted EVANS at phone number (616) 929-2112, to set up the drug transaction.

13. Officer Lenneman provided the CS with $40 in pre-recorded funds for the purpose of purchasing crack cocaine from EVANS. The CS then drove, in the CS's vehicle, directly to the EVANS's residence at 1112 Kelsey, Lansing, while under the surveillance of law enforcement officers.

14. Surveillance observed the CS arrive at 1112 Kelsey and then depart shortly thereafter in the CS's vehicle. Surveillance observed the CS drive back to the predetermined meeting location, where the CS produced to law enforcement a clear pill capsule containing a white substance. Inside the pill capsule was 3.1 grams of a substance that tested positive for cocaine base (*i.e.*, crack cocaine). Officer Lenneman again searched the CS for contraband or U.S. currency, with negative results.

15. Based on the information described above, I believe that the CS purchased 3.1 grams of crack cocaine from EVANS inside his residence June 24, 2020.

**C. July 9, 2020 Controlled Purchase of .18 Grams Cocaine Base from EVANS and HINTON**

On July 9th, 2020, SOS used the CS to conduct a controlled purchase of crack cocaine from EVANS and HINTON. Prior to the operation, SOS Officer Jeffrey

Lenneman met with the CS at a predetermined location, where Officer Lenneman searched the CS and the CS's vehicle for contraband and U.S. currency, with negative results. In the presence of Officer Lenneman, the CS again contacted EVANS at phone number (616) 929-2112, on speaker phone, to set up the drug transaction. EVANS directed the CS to meet at the area of Boston and Mount Hope, approximately 5 blocks from EVANS's residence at 1112 Kelsey. Officer Lenneman provided the CS with $40 in pre-recorded funds for the purpose of purchasing crack cocaine from EVANS.

16.    The CS then drove, in the CS's vehicle, directly to the area of Boston and Mount Hope, in Lansing, while under the surveillance of law enforcement officers. Around the same time, surveillance officers observed a black BMW leave 1112 Kelsey Avenue and drive to meet the CS at Boston and Mount Hope. While conducting surveillance, Officer Lenneman observed that KEEGAN HINTON was the driver and lone occupant of the BMW. Officer Lenneman observed HINTON meet briefly with the CS at Boston and Mount Hope, after which HINTON and the CS departed the area in their respective vehicles.

17.    Surveillance observed the CS drive back to the predetermined meeting location, where the CS produced to law enforcement a clear pill capsule containing a white substance, which field-tested positive as .18 grams of cocaine base. Officer Lenneman again searched the CS for contraband and U.S. currency, with negative results.

18. Based on the information described above, I believe that the CS purchased .18 grams of crack cocaine from EVANS and HINTON on July 9, 2020.

### D. July 29, 2020 Controlled Purchase of .21 Grams Cocaine Base from EVANS and HINTON

On July 29th, 2020, SOS used the CS to conduct a controlled purchase of crack cocaine from EVANS. Prior to the operation, SOS Officer Jeffrey Lenneman met with the CS at a predetermined location, where Officer Lenneman searched the CS and the CS's vehicle for contraband and U.S. currency, with negative results. In the presence of Officer Lenneman, the CS again contacted EVANS at phone number (616) 929-2112, on speaker phone, to set up the drug transaction. Officer Lenneman provided the CS with $40 in pre-recorded funds for the purpose of purchasing crack cocaine from EVANS.

19. The CS then drove, in the CS's vehicle, directly to 1112 Kelsey Avenue while under the surveillance of law enforcement. SOS Officer Lenneman observed the CS get out of the vehicle at 1112 and meet outside, briefly, with EVANS and HINTON. Officer Lennemean observed the CS return to the CS's vehicle.

20. Surveillance observed the CS drive back to the predetermined meeting location, where the CS produced to law enforcement a small plastic baggie containing a white substance. The substance field-tested positive as .21 grams of cocaine base. Officer Lenneman again searched the CS for contraband and U.S. currency, with negative results.

21. Based on the information described above, I believe that the CS purchased .21 grams of crack cocaine from EVANS and HINTON on July 29, 2020.

### E.  August 3, 2020 Controlled Purchase of .33 Grams Heroin from EVANS

On August 3, 2020, SOS used the CS to conduct a controlled purchase of heroin from EVANS. Prior to the operation, SOS Officer Jeffrey Lenneman met with the CS at a predetermined location, where Officer Lenneman searched the CS and the CS's vehicle for contraband and U.S. currency, with negative results. In the presence of Officer Lenneman, the CS again contacted EVANS at phone number (616) 929-2112, on speaker phone, to set up the drug transaction. Officer Lenneman provided the CS with $40 in pre-recorded funds for the purpose of purchasing crack cocaine from EVANS.

22.  The CS then drove, in the CS's vehicle, directly to 1112 Kelsey Avenue while under the surveillance of law enforcement. SOS Officer Lenneman observed the CS get out of the vehicle at 1112 and meet outside, briefly, with EVANS. Law enforcement observed the CS return to the CS's vehicle.

23.  Surveillance observed the CS drive back to the predetermined meeting location, where the CS produced to law enforcement a small baggie containing a .33 grams of a substance that field-tested positive as heroin. Officer Lenneman again searched the CS for contraband and U.S. currency, with negative results.

24.  Based on the information described above, I believe that the CS purchased .33 grams of heroin from EVANS on August 3, 2020.

### F.  Execution of Search Warrant on August 4, 2020

25.  On August 4th, 2020, SOS Officer Jeffrey Lenneman obtained a State of Michigan warrant to search the residence at 1112 Kelsey Ave Lansing, Michigan, the

2003 BMW with license plate DAW701, which was driven by HINTON when she delivered crack cocaine to the CS on July 9, 2020, a 1974 Chevrolet, and the persons of EVANS and HINTON, as well as any cell phones recovered during the searches. The search warrant explicitly allowed for law enforcement to seize and search:

> Cellular telephones including the entire data contents, numbers assigned to the phone, telephone calls received and sent, numeric contact numbers stored and the names associated, digital pictures, videos, voice recordings, text messages sent and received, recorded calendar events, internet use if enabled or any other retrievable data included in the phone

for evidence of delivery, possession, and use of controlled substances, including heroin and cocaine, as well as related paraphernalia and records.

26. Law enforcement executed the search warrant the same day—August 4, 2020. When the search was executed, EVANS was driving the BMW, having just left the residence at 1112 Kelsey Ave. Officers conducted a traffic stop of the BMW and searched EVANS and the vehicle while other officers conducted a search of the residence at 1112 Kelsey Ave.

    a.    **Drugs, Paraphernalia, and Phones Recovered from 1112 Kelsey Ave. and the BMW**

27. During the course of searching the residence at 1112 Kelsey Ave., SOS Officers seized various substances that field-tested positive as the controlled substances described below, as well as drug trafficking paraphernalia and residency documents:

> From the north/west bedroom law enforcement recovered:
> - Four bags of clear empty pill capsules and some loose empty pill capsules
> - Residency and bank paperwork for HINTON;
> - 4 grams of cocaine

10

- Less than 1 gram of heroin
- A pill press and Mannitol (cutting agent)

From the kitchen law enforcement observed and/or seized:
- Latex gloves
- Razor blades
- A plastic bag containing three baggies of cocaine
- 4 grams of fentanyl (with packaging)
- 8 grams of grey-colored heroin
- 2 grams of crack cocaine
- 2 grams of crack cocaine in a baggie
- Less than 1 gram of cocaine in a small baggie
- 6 grams of tan-colored heroin
- Pill capsules
- Digital scale
- Plastic ziplock bag containing smaller baggies
- Plastic bag containing clear pill capsules
- A box of fold-top plastic bags

From the north/east bedroom law enforcement recovered:
- $451 in United States currency
  White iPhone with teal case, claimed by HINTON, who provided access code of 202039 **(Subject Device 3)**
- Black iPhone with black case[2]
- Federal Supervised Release paperwork for EVANS

From the BMW, driven by EVANS at the time of the search, law enforcement recovered:
- Black iPhone in black case, located in the front passenger seat **(Subject Device 1)**
- Silver cell phone in black case, recovered from EVANS's person during traffic stop and execution of search warrant **(Subject Device 2).**
- $50 in tan wallet containing EVANS's photo ID

---

[2] Law enforcement subsequently determined that this cell phone was not functional. As such, this request does not seek authorization to search this iPhone.

11

**G.     The Subject Devices**

28.     LPD SOS Officers collected the **Subject Devices** as evidence and tagged them into LPD Property & Supply per LPD Policy. Because the state search warrant allowed for the search of cell phones, law enforcement with LPD examined the phones to retrieve their SIM cards and IMEI numbers, which are included in the descriptions of the **Subject Devices**. Additionally, LPD successfully extracted the data and contents of **Subject Device 3**. LPD was unable to extract the contents of **Subject Device 1** and **Subject Device 2** due to passcodes on those phones. I know from my training and experience that the Michigan State Police has additional technologies that may allow it to successfully extract the data and contents of **Subject Device 1** and **Subject Device 2**.

29.     Although the state obtained a search warrant that covers the **Subject Devices**, because this is now a federal investigation, I am seeking authority from this Court in an abundance of caution, to permit law enforcement personnel to search the contents of the **Subject Devices** for evidence of violations of federal law, specifically the **Subject Offenses** described above. The **Subject Devices** have been maintained in the custody of LPD since August 4, 2020, when they were seized.

30.     Based on my training and experience, I know that drug traffickers frequently use more than one cell phone to conduct their drug trafficking business. For example, I have encountered drug dealers that use one cell phone/phone number to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers. I have also encountered drug dealers who use one cell phone/phone number for certain customers and co-conspirators with whom they

12

have long-standing relationships that the drug dealers believe are more trustworthy, and a separate cell phone/phone number to communicate with lesser known and lesser trusted customers.

31. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their cell phones;

b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

d. Global Position System (GPS) data on cell phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

e. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

13

  f. Drug traffickers often use their cell phones to use the internet to look up various information to support their drug trafficking activities;

  g. Drug traffickers often have unexplained wealth and do not report drug-trafficking income on their state or federal tax returns. Subjects often use cash, money orders, cashier's checks, and prepaid debit cards as a way of purchasing items to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members, in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, and receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Further, drug traffickers maintain these types of books, records, receipts, notes, ledgers, etc., where they have ready access to them, including in their electronic devices and cell phones.

## TECHNICAL TERMS

32. The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B). Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless/cell phone: A wireless telephone (or mobile telephone, or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages, instant messages, and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store

15

other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless

communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

33.  Based on my training, experience, and research, I know that most "smart phones" have capabilities that allow them to access the internet and to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. The **Subject Devices** are "smart phones" that are the types of cellular telephones with these capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence of crimes.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

- Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

- The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.

> Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
>
> - Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## REQUEST TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

37. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Moreover, law enforcement will be conducting its search of the **Subject Devices** in a law enforcement setting over a potentially prolonged period of time. Consequently, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

38. Based on the foregoing, I submit that there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846 will be found in the **Subject Devices**, described in Attachment A, and request a warrant to examine the **Subject Devices** for the items described in Attachment B.